UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CHRISTEN H. WHITE            )
                            )
        Plaintiff,          )
                            )
    v.                      )        Cause No. 3:16-cv-284-RLM-MGG
                            )
DIGGER SPECIALTIES, INC.,   )
                            )
        Defendant.          )

OPINION AND ORDER

On February 12, 2015, Digger Specialties, Inc. terminated Christen White's employment as an inventory clerk. Ms. White sues Digger Specialties for violations of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e-5) for alleged employment discrimination because of Ms. White's sex and religion. Ms. White further claims that she was subject to a hostile work environment and retaliation. Digger Specialties moves for summary judgment on all claims. The court heard argument on September 13, and now grants the motion.

I.      BACKGROUND

Ms. White started working for Digger Specialties in the spring of 2007 as an inventory control clerk. In May 2014, Ms. White took a medical leave of absence to undergo a hysterectomy. She was absent from work at Digger Specialties for about two weeks after her surgery. Shortly before her hysterectomy, Ms. White

and her supervisor, Norm Hochstetler, talked about her surgery. Mr. Hochstetler had originally hired Ms. White and had been her supervisor throughout her entire employment at Digger Specialties.

Ms. White contends that Mr. Hochstetler told her during this conversation that she would be emotional after her surgery. Ms. White also alleges that once she took her medical leave of absence, Digger Specialties employee Dora Miller told Ms. Miller's sister and co-employee about Ms. White's hysterectomy. Upon her return to work, certain accommodations were made for Ms. White including moving her work station to the ground level and having another Digger Specialties employee gather work orders for her.

Ms. White had gotten good work reviews up until her termination, but she had difficulties with getting along with other Digger Specialties employees, including Dora Miller. In the summer of 2014 Ms. White received a written warning for an incident with a heat shrink gun. The incident didn't involve Ms. White, and she didn't see it. It was found through an internal investigation that Ms. White had engaged in improper communication with the employee who had been operating the heat shrink gun. The written warning stated that if she didn't refrain from involving herself in the matters of other employees, her employment could be terminated.

Ms. White involved herself in a number of work related pranks in the winter of 2015. She wasn't the instigator, the target, nor a witness to these pranks. No one directly involved with the pranks reported them. On February 12, 2015 Ms. White was terminated during a meeting with a number of Digger Specialties

management team members. The reason given for her termination was that her continued participation in gossip and involvement in work place matters that didn't concern her, which had a disruptive effect on Digger Specialties. Ms. White believes she was fired because of retaliation and for her not being Amish.

After Digger Specialties fired her, Ms. White filed an Equal Employment Opportunity Commission charge for sexual discrimination on August 6, 2015. On May 10, 2016 Ms. White filed suit against Digger Specialties alleging violations of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e-5). These allegations include claims of sex discrimination, religious discrimination, a hostile work environment, and retaliation. The court views all alleged facts and reasonable inferences in the light most favorable to Ms. White and will address each of her claims in turn.


## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact." Protective Life Ins. Co. v. Hansen, 632 F.3d 388, 391-92 (7th Cir. 2011). When no genuine issue of material fact exists, "the movant is entitled to judgment as a matter of law." Dunkin v. Appriss, Inc., 266 F. Supp. 3d 1103, 1106 (N.D. Ind. July 18, 2017). The movant has the burden of demonstrating to the court the basis for its motion that there exists no genuine issue of material fact. Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986). In demonstrating this burden, the evidence must be viewed in the light most favorable to the non-

moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). When the movant has met its burden, the opposing party can't rely solely on the allegations in their pleadings, but must "point to evidence that can be put in admissible form at trial, and that, if believed by the fact-finder, could support judgment in his favor." <u>Marr v. Bank of America, N.A.</u>, 662 F.3d 963, 966 (7th Cir. 2011); see also <u>Steen v. Myers</u>, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting <u>Hammel v. Eau Galle Cheese Factory</u>, 407 F.3d 852, 859 (7th Cir. 2005) (summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.")). The non-moving party can't rely on conclusory allegations. <u>Smith v. Shawnee Library System</u>, 60 F.3d 317, 320 (7th Cir. 1995). Failure to prove an essential element of the alleged activity will render other facts immaterial. <u>Celotex v. Catrett</u>, 477 U.S. at 323; <u>Filippo v. Lee Publications, Inc.</u>, 485 F.Supp.2d 969, 972 (N.D. Ind. 2007) (the non-moving party "must do more than raise some metaphysical doubt as to the material facts; he must come forward with specific facts showing a genuine issue for trial.").

## III. DISCUSSION

Ms. White argues that Digger Specialties violated Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e-5). She argues that while she worked at Digger Specialties, she was subject to sex and religious discrimination, and a hostile work environment. Ms. White also claims that her termination was

retaliatory and pretextual because of her religion and the religion on her supervisor.

## A. Sex Discrimination

Before bringing a claim under Title VII, Ms. White must have first filed a charge of discrimination with the EEOC. While the statute of limitations for filing an EEOC charge is 180 days, Indiana has increased the time limit to file to 300 days. 42 USCS § 2000e-5(e) (identifying Indiana as a "deferral state"). The time to file the EEOC charge ordinarily begins to run at the time of the alleged discrimination. If the alleged discrimination or its effects aren't readily apparent, a plaintiff can delay filing an EEOC charge "until a series of wrongful acts blossoms into an injury on which suit can be brought." Limestone Dev. Corp. v. Vill. of Lemont, Ill., 520 F.3d 797, 801 (7th Cir. 2008). These "cumulative violations" arise when it isn't clear at first that the law is being violated. Limestone Dev. Corp. v. Lemont, 520 F.3d at 801. Often times, what begins as offensive behavior builds until there is a tangible negative impact on the plaintiff's employment conditions. Bass v. Joliet Public School. Dist. No 86, 746 F.3d 835, 839 (7th Cir. 2014); Dasgupta v. University of Wisconsin Bd. of Regents, 121 F.3d 1138, 1139 (7th Cir. 1997). Ms. White filed her EEOC charge on August 6, 2015. Unless she can adequately allege a cumulative violation, the statute of limitations bars any claim of discrimination arising before October 10, 2014.

The conduct relating to the alleged sex discrimination occurred in May 2014. Garrison v. Burke, 165 F.3d 565, 507 (7th Cir. 1999) (remarking that individual, isolated, and non-related acts of discrimination can't be the basis for the use of the cumulative violation doctrine). Ms. White doesn't allege other conduct on or after October 10, 2014 – or any other conduct for that matter – relating to sex discrimination during her employment at Digger Specialties. Ms. White can't use alleged religious discrimination to retroactively legitimize her sex discrimination claim. Ms. White hasn't sufficiently alleged that her sex discrimination claim isn't time-bared by the EEOC's statute of limitations. Ms. White hasn't adequately alleged that Mr. Hoschetetler's comment about post-surgical emotion is "closely related enough" to the creation of a hostile work environment: a statement about Ms. White's hysterectomy isn't closely related to alleged harassment based on her not being Amish.

Ms. White says she has properly linked her sex discrimination claim to her hostile work environment clam and retaliation claim, and so has adequately alleged a cumulative violation. Ms. White's retaliation claim is based solely on her religious discrimination claim. Her retaliation claim can't serve as an adequate basis for linking cumulative violations because it doesn't relate closely enough to her sex discrimination claim. Koelsch v. Beltone Elecs. Corp., 46 F.3d 705, 707 (7th Cir. 1995) ("the facts alleged to have occurred within the three-hundred-day period must be related closely enough to the previous acts such that they are to be considered one ongoing violation") (internal quotations omitted). Ms. White hasn't shown that the offensive comment made by her boss

Mr. Hochstetler in May 2014 is "related closely enough" to her employment termination.

Even if Ms. White could overcome the timeliness hurdle, she hasn't pointed to evidence or facts sufficient to establish a *prima facie* case of sex discrimination under Title VII. Ms. White can try to establish a *prima facie* case under the direct method or indirect method. <u>Coleman v. Donahoe</u>, 667 F.3d 835, 845 (7th Cir. 2012). While Ms. White contends that she has provided sufficient evidence under either method; the court disagrees.[1] See <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). Under the direct method, Ms. White must "must marshal sufficient evidence, either direct or circumstantial, that an adverse employment action was motivated by discriminatory animus." <u>Porter v. City of Chicago</u>, 700 F.3d 944, 954 (7th Cir. 2012); <u>Coleman v. Donahoe</u>, 667 F.3d 835, 845 (7th Cir. 2012) ("[u]nder the direct method, the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action") (internal quotations omitted). Under the indirect, or burden-shifting method, the plaintiff carries "the initial burden under the statute of establishing a *prima facie* case of . . . discrimination." <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). This method requires the plaintiff to "demonstrate that (1) he belongs

---

[1] Ms. White's brief appears to confuse the standard. Ms. White argues that she can sufficiently show sex discrimination under the direct, indirect, or burden shifting method. Sufficient evidence must either be shown under the "direct method" or the "indirect method" – the "burden shifting method" outlined in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973) is the "indirect method."

to a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) his employer treated similarly-situated employees outside of his protected class more favorably." Stockett v. Muncie Indiana Transit System, 221 F.3d 997, 1001 (7th Cir. 2000). Since the direct method requires a showing of an "adverse employment action," the court addresses this argument with the indirect method's analysis of adverse employment actions. Coleman v. Donahoe, 667 F.3d at 845.

Being a member of a protected class is the first prong of the indirect method. Stockett v. Muncie Indiana Transit System, 221 F.3d 997, 1001 (7th Cir. 2000). Ms. White belongs to a protected class: she alleges that she was discriminated against because of her sex, which fulfills the requirements of 42 U.S.C. § 2000e. There is enough evidence to show that Ms. White performed her job satisfactorily – she received favorable work reviews during the course of her employment at Digger Specialties. Ms. White hadn't received any formal disciplinary action before or at of the time of alleged discrimination. This fulfils the second prong of the indirect method. Stockett v. Muncie Indiana Transit System, 221 F.3d at 1001.

Ms. White can't point to evidence that she was subject to an adverse employment action on account of her sex. Stockett v. Muncie Indiana Transit System, 221 F.3d at 1001. She first alleges that her boss, Mr. Hochstetler, made inappropriate comments about Ms. White's hysterectomy: that Mr. Hochstetler remarked that her hysterectomy would cause her to be emotional when she returned to work. Ms. White also alleges that after her hysterectomy, she was

restricted from collecting work orders and that Mr. Hochstetler made several notations on Ms. White's behaviors in her personnel file.

Digger Specialties made a number of accommodations after Ms. White's hysterectomy. Digger Specialties moved Ms. White's work station downstairs to the main floor and had another employee collect work orders so that Ms. White wouldn't have to expose herself to unnecessary movement. Some of Ms. White's restrictions appear problematic on their face. Ms. White claims that she was restricted to remain seated at her work station, or else she would be sent home. But the record also shows that Ms. White ignored her doctor's advice to take six weeks off after her surgery, and returned to work in under two weeks – resulting in surgery related bleeding within days of her return.

These accommodations and restrictions were reasonable. See Porter v. City of Chicago, 700 F.3d 944, 953 (7th Cir. 2012). Employers needn't engage in "hand-holding" but instead should act with "bilateral cooperation" with employees seeking accommodations. Porter v. City of Chicago, 700 F.3d at 953. When Ms. White decided to return to work over a month earlier than her doctor recommended, she required her work station to be moved and her work delivered to her. Digger Specialties reasonably accommodated her by moving her work station to the ground floor and assigning another employee to collect her work. Placing additional mobility restrictions in light of Ms. White's post-surgery bleeding is reasonable. No reasonable trier of fact could find that these restrictions amounted to an adverse employment action or that Digger Specialties failed to reasonably accommodate her.

Mr. Hochstetler's comments on Ms. White's hormones in relation to her hysterectomy are problematic on their face. They aren't comments one would like to hear from a supervisor. However, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998); <u>Moser v. Ind. Dep't of Corr.</u>, 406 F.3d 895, 903 (7th Cir. 2005). Another way of looking at this is to consider whether the conduct was "sufficiently severe or pervasive" as to cause an adverse employment action. <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 67 (1986); <u>Cole v. Bd. of Trs.</u>, 838 F.3d 888, 895 (7th Cir. 2016). This is both a subjective and objective determination. <u>Hilt-Dyson v. City of Chicago</u>, 282 F.3d 456, 463 (7th Cir. 2002). With no other offensive comments alleged to have been made by Mr. Hochstetler to Ms. White, the incident relation to Ms. White's hormones reasonably appears to be isolated and not pervasive. [2]

An isolated incident doesn't defeat Ms. White's allegations if the alleged conduct was sufficiently severe. <u>Jackson v. County of Racine</u>, 474 F.3d 493, 499 (7th Cir. 2007) ("[o]ne instance of conduct that is sufficiently severe may be enough"). Examples of sufficiently severe conduct include physical assault or the creation of environment in which the victim fears that such physical assault is imminent. <u>Hostetler v. Quality Dining, Inc.</u>, 218 F.3d 798, 809 (7th Cir. 2000) (forcible kissing and attempts to remove clothing of coworker); <u>Smith v. Sheahan</u>, 189 F.3d 529, 532 (7th Cir. 1999) (physical assault); <u>Porter v. Erie Foods Int'l,</u>

---

[2] It is also unclear how private notes that were made by Mr. Hochstetler and not shared with Ms. White could lead to her perception of pervasive sex discrimination.

Inc., 576 F.3d 629, 636 (7th Cir. 2009) (the presence of multiple nooses caused the plaintiff to fear for his own safety and that of his family). Ms. White hasn't adequately alleged conduct that rises to what the courts consider severe. Additionally, if Ms. White subjectively felt that Mr. Hochstetler's comment was severe, she had ample opportunity to report it to a human resources professional at Digger Specialties. While not reporting inappropriate behavior ordinarily defeat a plaintiff's claim, it is evidence as to the lack of severity of the behavior as the victim perceived it. In absence of any reason why such conduct went unreported, "[i]f the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she shouldn't recover damages that could have been avoided if she had done so." Faragher v. City of Boca Raton, 524 U.S. 775, 806-807 (1998). Scurlock v. IRC, LP, 716 Fed. Appx. 544, 546-547 (7th Cir. 2017).

Finally, the summary judgment record wouldn't support a finding that that Digger Specialties treated similarly-situated employees outside of Ms. White's protected class more favorably. The record shows, and Ms. White herself argues, that thirteen other employees at Digger Specialties were placed on medical leave during the relevant time period but that none were warned about being emotional upon their return. Eleven out of the thirteen employees were female, which suggests that both male and female employees were treated similarly because none were warned about being emotional. Ms. White even concedes that Digger Specialties treated both similarly situated male and female employees more favorably than White. As stated above, Ms. White belongs to a protected class

because of her sex – she doesn't belong to the protected class consisting only of herself.

Under the direct method, the summary judgment record wouldn't support a finding that an adverse employment action affecting Ms. White was motivated by "discriminatory animus." <u>Porter v. City of Chicago</u>, 700 F.3d 944, 954 (7th Cir. 2012); <u>Coleman v. Donahoe</u>, 667 F.3d 835, 845 (7th Cir. 2012). Ms. White can offer either "direct evidence that would prove the fact in question – the discriminatory intent – without reliance on inference or presumption, or a 'convincing mosaic' of circumstantial evidence that would allow a jury to infer the intentional discrimination by the decisionmaker." <u>Silverman v. Bd. of Educ.</u>, 637 F.3d 729, 734 (7th Cir. 2011) (internal citations omitted); See also <u>Coffman v. Indianapolis Fire Department</u>, 578 F.3d 559, 563 (7th Cir. 2009); <u>Phelan v. Cook County</u>, 463 F.3d 773, 779 (7th Cir. 2006). A plaintiff proceeding under the "convincing mosaic" approach can rely on any of three broad categories of circumstantial evidence. <u>Silverman v. Bd. of Educ.</u>, 637 F.3d at 734. The first category includes "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." <u>Silverman v. Bd. of Educ.</u>, 637 F.3d at 734 quoting <u>Troupe v. May Department Stores Co.</u>, 20 F.3d 734, 736 (7th Cir. 1994). The second category includes evidence that the employer "systematically treated other, similarly situated, [...] employees better." <u>Silverman v. Bd. of Educ.</u>, 637 F.3d at 734 quoting <u>Venturelli v. ARC Community Services, Inc.</u>, 350 F.3d 592, 601 (7th Cir.

2003). The third category includes "evidence that the plaintiff suffered an adverse employment action and that the employer's justification is pretextual." <u>Silverman v. Bd. of Educ.</u>, 637 F.3d at 734.

The summary judgment record wouldn't support a finding that an adverse employment action was motivated by "discriminatory intent" or "animus." <u>Silverman v. Bd. of Educ.</u>, 637 F.3d at 734. As already discussed, Ms. White has not shown that she was subject to an adverse employment action because of her sex. The record contains no evidence to support the inference that her supervisor, Mr. Hochstetler, acted with discriminatory animus when he commented on her post-surgery emotions or in establishing certain accommodations for Ms. White after her hysterectomy. No direct evidence has been offered to show that Mr. Hochstetler held misogynistic beliefs or that he made similar comments to other women at Digger Specialties.

Similarly, the summary judgment record doesn't provide a "convincing mosaic" of potential conduct that would convince a reasonable jury that Ms. White faced sex discrimination. <u>Silverman v. Bd. of Educ.</u>, 637 F.3d at 734. Under the first category of evidence Ms. White can offer the court, the summary judgment record wouldn't support a finding that the timing of Mr. Hochstetler's comments and accommodations were suspicious or ambiguous, or that he made comments directed towards other female employees at Digger Specialties. <u>Silverman v. Bd. of Educ.</u>, 637 F.3d at 734. On the contrary, the timing of his comments and accommodations were directly related to a specific situation – Ms. White's hysterectomy. The comments and accommodations are also

unambiguous – they too relate to Ms. White's hysterectomy. Finally, as previously discussed, Mr. Hochstetler made no similar comments to other female employees at Digger Specialties.

Under the second category of evidence Ms. White can offer the court, the summary judgment record wouldn't support a finding that Mr. Hochstetler or Digger Specialties systematically treated other similarly situated employees better than Ms. White. Silverman v. Bd. of Educ., 637 F.3d at 734. Ms. White offers virtually no evidence to support the assertion that male counterparts, or even female counterparts who have not had a hysterectomy, faced any worse or better treatment than herself. What little evidence there is in the record, such as Ms. White being paid the same wages as other female employees under Mr. Hochstetler's supervision, suggests that Ms. White was not systematically treated differently because of her gender.

Finally, under the third category of evidence Ms. White can offer, the summary judgment record wouldn't support a finding that Ms. White suffered an adverse employment action and that such action was pretextual. Silverman v. Bd. of Educ., 637 F.3d at 734. As previously discussed, Ms. White faced no adverse employment action and there is no evidence in the record to suggest that Mr. Hochstetler or Digger Specialties held any beliefs or acted in any way that would suggest a pretextual motive.

## B. Religious Discrimination

Ms. White hasn't pointed to evidence sufficient to establish a *prima facie* case of religious discrimination under Title VII. While the court can apply the McDonnell Douglas balancing text, the appeals court has often used a more flexible approach in religious discrimination cases. Sattar v. Motorola, Inc., 138 F.3d 1164, 1169-1170 (7th Cir. 1998). Ms. White argues that the court should use this standard. Sattar v. Motorola removes the protected class and similarly situated requirements under McDonnell Douglass and adds the requirement that the plaintiff shall show "some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs." Sattar v. Motorola, 138 F.3d at 1169-1170 (quoting Shapolia v. Los Alamos Nat'l Laboratory, 992 F.2d 1033, 1038 (10th Cir. 1993) (footnote omitted)). So Ms. White must point to evidence that would allow a finding that her termination was because she didn't hold or follow the religious beliefs of her supervisor Mr. Hochstetler.

Mr. Hochstetler is Amish. Ms. White isn't. Ms. White claims that because she isn't Amish, Mr. Hochstetler subjected her to adverse employment actions, eventually leading to her termination. Ms. White maintains that her performance record was positive leading up to her termination and that the criticism contained within her performance evaluation were only suggestions for improvement. Ms. White also contends that Digger Specialties employed a

progressive disciplinary system and a concurrent policy allowing for employees to be placed on probation in lieu of immediate termination. The record supports these facts.

The record doesn't support Ms. White argument that by not following every single step of its disciplinary system, Digger Specialties has engaged in *prima facie* religious discrimination. In the June 2014 disciplinary action that Ms. White maintains was the only disciplinary action she received while at Digger Specialties, Ms. White was specifically warned that future discipline could result in employment termination. The record also doesn't support that Ms. White faced only one disciplinary action during her time at Digger Specialties. Ms. White received warnings and suggestions starting in 2011 and continually throughout her employment at Digger Specialties. Leading up to Ms. White's termination, she was warned repeatedly not to engage in gossip or to insert herself into situations involving other employees.

Ms. White points to an incident involving Amish employees pranking non-Amish employees. Despite having been warned not to involve herself with situations of other employees, Ms. White eventually reported the prank to Digger Specialties management. Ms. White wasn't a target of the prank and no one else involved with the prank reported the incident. Ms. White argues that since the Amish employees who committed the prank were only lightly reprimanded by Mr. Hochstetler while she was fired, this is evidence of religious discrimination. In oral argument, Ms. White referred to evidence of disparate treatment among Amish and non-Amish employees, stating that out of 45 Digger Specialties

employees that had their employment terminated, only one was Amish. The record provides no context to her numbers – one out of 45 employees could be representative of Digger Specialties' body of Amish workers.

More fundamentally, Ms. White's argument confuses the standard. Ms. White specifically urges the court to consider this case under the flexible standard of in <u>Sattar v. Motorola, Inc.</u>, 138 F.3d 1164, 1169-1170, instead of the more traditional standard of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973) that considers disparate treatment between similarly situated employees. Basing an argument on disparate treatment essentially asks the court to apply a more stringent standard than what was originally advocated for. Nevertheless, under either standard, Ms. White hasn't sufficiently alleged evidence that would lead a reasonable jury to determine that she was subject to religious discrimination.

The record shows that Ms. White's employment was terminated because of continued participation in behavior previously reprimanded by her supervisors, not because she reported a prank committed by Amish employees. Ms. White hasn't pointed to evidence in the record that could support a finding Mr. Hochstetler terminated her employment because she wasn't Amish. <u>Ost v. W Suburban Travelers Limousine, Inc.</u>, 88 F.3d 435, 441 (7th Cir. 1996) ("a plaintiff's own opinions about [his] work performance or qualifications don't sufficiently cast doubt on the legitimacy of [his] employer's proffered reasons for its employment actions."). Mr. Hochstetler initially hired her, gave her positive performance reviews, and recommended that she receive a raise. Other

supervisors that participated in and signed off on her termination decision weren't Amish. Ms. White has further provided no evidence that her religion was ever even commented on by her supervisors and coworkers or made known in any way to those around her.

Even if Mr. Hochstetler were the sole decision-maker in Ms. White's termination – or if all the decision makers were Amish – the only evidence in the record to support Ms. White's religious discrimination claim is that she's not Amish. This, without more, can't lead a reasonable jury to determine that her termination was based on her religion. The summary judgment record doesn't support a viable religious discrimination claim. See Porter v. City of Chicago, 700 F.3d 944, 956 (7th Cir. 2012) (finding that even off-handed comments relating to the plaintiff's religion didn't reach the standard necessary to survive a motion to dismiss); Abdel-Ghaffar v. Ill. Tool Works, Inc., 2015 U.S. Dist. LEXIS 111940, *32-*38 (N.D. Ill.  August 24, 2015.).


*C.  Hostile Work Environment*

Ms. White can't point to evidence that could establish a *prima facie* case of a hostile work environment under Title VII. Whether a work environment could be considered "hostile" looks to the "totality of the circumstances." Venters v. City of Delphi, 123 F.3d 956, 975 (7th Cir. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)). Factors relevant to this analysis include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening

or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employees' work performance." Venters v. City of Delphi, 123 F.3d at 975; Porter, 700 F.3d at 956. Not unlike the court's analysis of Ms. White's sex discrimination claim, the court must consider whether the alleged conduct was so "sufficiently severe or pervasive" as to cause a hostile work environment. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 67 (1986): Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 534 (7th Cir. 1993). This opinion already explained that Mr. Hochstetler's comment to Ms. White about her hysterectomy was neither severe nor pervasive, and that the summary judgment record can't support a finding of religious discrimination. Ms. White must offer some new evidence to support her hostile work environment allegation.

Ms. White details several additional incidents that she argues supports her hostile work environment claim. She claims that two of her coworkers had thrown paper at her. She also claims that when Dora Miller, one of the employees who had thrown paper, was transferred into her department, her work environment changed. Specifically, Ms. White says that Miller's transfer into the department made Ms. White feel unequal. Ms. White argues that because Dora Miller was Amish, Mr. Hochstetler gave Ms. Miller favorable treatment to the detriment Ms. White, creating an unequal and hostile workplace. To support this, Ms. White alleges a wage discrepancy between herself and Dora Miller and further alleges that Mr. Hochstetler lied about the discrepancy to benefit Dora Miller.

The record doesn't support these allegations. The record shows that Ms. White and Dora Miller received the same wages. The summary judgment record contains nothing to support Ms. White's claim that Mr. Hochstetler lied about his employees' wages.

An isolated paper throwing incident, much like an off-hand offensive comment, simply doesn't rise to level of "sufficiently pervasive." Porter v. City of Chicago, 700 F.3d at 956. Even long term animosity between employees doesn't rise to the level of "sufficiently pervasive." Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998). Neither a paper throwing incident nor animosity towards coworkers described in this case rises to the level of severity to sustain a hostile work environment claim. Porter v. City of Chicago, 700 F.3d at 956. Without more, the summary judgment record does not, even when viewed as favorably as possible to Ms. White, contain enough evidence for a reasonable jury to decide that the work environment was hostile. See Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010) ("[w]e often call summary judgment the 'put up or shut up' moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely.") (internal citations omitted)).

*D. Retaliation*

Ms. White hasn't adequately alleged sufficient evidence or facts to establish a *prima facie* case of a hostile work environment under Title VII. Ms. White's main contention is that the she was fired because she wasn't Amish. As already explained, Ms. White didn't face any adverse employment action, up to and including her termination, because of any religious discrimination on the part of Digger Specialties. Ms. White claims that because she reported a number of pranks made by Amish employees against non-Amish employees, she was subject to a retaliatory discharge. To make out a *prima facie* case of retaliation under Title VII, Ms. White must show that: 1) she was engaged in a statutorily protected activity; 2) she suffered an adverse employment action; and 3) there was a causal connection between her protected activity and the employment action. Rennie v. Dalton, 3 F.3d 1100, 1109 (7th Cir. 1993).

Ms. White didn't participate in statutorily protected activity before Digger Specialties fired her. Ms. White argues that her reporting of the workplace pranks resulted in her termination. Engaging in a strictly internal process like reporting workplace pranks doesn't fall under the protected activity of 42 U.S.C. § 2000e-3. Even if one were to construe Ms. White's reporting as an "investigation" under 42 U.S.C. § 2000e-3 "doesn't include an investigation by the employer, as distinct from one by an official body authorized to enforce Title VII." Hatmaker v. Mem'l Med. Ctr., 619 F.3d 741, 747 (7th Cir. 2010) ("[a] purely internal investigation doesn't involve a "charge," or testimony, and neither is it a "proceeding" or a

"hearing." To bring an internal investigation within the scope of the clause we would have to rewrite the statute."); *but cf.* <u>Abbott v. Crown Motor Co.</u>, 348 F.3d 537, 543 (6th Cir. 2003) (noting that when an employer receives a formal EEOC charge any internal investigation following the official charge should be treated as an official investigation).

### E. Pretext

Even if the record supported a finding of a *prima facie* case of religiously based discrimination or retaliation, it couldn't support a finding that Digger Specialties acted with a pretextual motive. Ms. White argues that upon her termination she was replaced by another employee, Marsha Hostetler, who belonged to the Mennonite religion. Ms. White contends that the Mennonite and Amish religions are so similar that they should be treated as the same and so be seen as further evidence of Amish favoritism at Digger Specialties. Ms. White also brings up an employment situation involving two other Digger Specialties employees that are irrelevant to Ms. White's termination.[3] Ms. White uses all of these examples as evidence of pretext.

While there is no set standard for showing pretext, it is generally accepted that pretext can be inferred by: 1) the reason for firing being factually baseless; 2) the reason for firing isn't the actual motivation for the employee's termination;

---

[3] This situation involved Marsha Hostetler and another employee, Trevor Ballinger, who Ms. White claims is neither Amish nor Mennonite. The employment incident resulted in the termination of the Trevor Ballinger, who had previously been subject to warning about his behavior. Marsha Hostetler, who hadn't previously received such reprimands, was given a written warning.

or 3) the reason for termination is insufficient. See <u>Johnson v. City of Fort Wayne</u>, 91 F.3d 922, 931 (7th Cir. 1996); <u>Forrester v. Rauland-Borg Corp.</u>, 453 F.3d 416, 419 (7th Cir. 2006) ("if the stated reason, even if actually present to the mind of the employer, wasn't what induced him to take the challenged employment action, it was a pretext.").

The record shows that Ms. White's replacement, Marsha Hostetler, was a non-observant Mennonite. The court doesn't see the validity in Ms. White's claims that Amish and Mennonite religions are so similar as to be considered the same. While Ms. White correctly points out that the Amish religion branched from the Mennonite religion (a split, the court notes, that occurred in 1693), her argument that since the Amish religion stems from the Mennonite religion there both are the same, is a logical fallacy. Dogmatic splits usually imply serious, irreconcilable differences between religious beliefs – religious factions don't often split because they wish to be considered so similar as to be one in the same. The Reformation didn't flow from Martin Luther starting Roman Catholic churches.

There are many distinguishing characteristics between Amish and Mennonite communities. These differences are noticeable in the daily life of these communities and to those who interact with them on a daily basis. Amish communities use horses for transportation while Mennonite communities use combustible engines. The difference between Mr. Hochstetler showing up for work on a bike or in a horse buggy and Marsha Hostetler by car would be readily apparent to anyone at Digger Specialties. While both are Anabaptist, the differences between these communities are as great as their similarities. Ms.

White can't adequately show why replacing her with a non-Amish (a non-practicing Mennonite) employee shows pretext of a bias against non-Amish employees. See <u>Young v. Digger Specialties, Inc.</u>, 2010 U.S. Dist. LEXIS 107468 (N.D. IN. October 5, 2010). Digger Specialties' stated reason for terminating Ms. White's employment was her failure to heed repeated warnings about her behavior. Ms. White hasn't pointed to evidence in the record to support a finding that this wasn't the reason for her termination or that this reason was somehow insufficient to explain her termination. <u>Johnson v. City of Fort Wayne</u>, 91 F.3d 922, 931 (7th Cir. 1996).


CONCLUSION

For the foregoing reasons, the court GRANTS the defendants' motion for summary judgment [Doc. No. 70]. The Clerk shall enter judgment accordingly.

SO ORDERED.

ENTERED:   <u>September 21, 2018</u>

<u>  /s/ Robert L. Miller, Jr.      </u>
Judge, United States District Court